IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR THE COUNTY OF KING

| | |
|---|---|
| BREANNA POST, on her own behalf and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NYSONIAN, INC., and NYSONIANSOLUTIONS, INC., D/B/A NOBL TRAVEL,<br><br>Defendants. | Case No.: 2:26-cv-00941-JHC<br><br>Honorable Judge John H. Chun<br><br>FIRST AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Breanna Post, on her own behalf and on behalf of others similarly situated, on information and belief except to her own experiences and matters of public record, complains of Defendants Nysonian, Inc., and Nysoniansolutions, Inc., doing business as Nobl Travel ("Nobl"), as follows:

## I. INTRODUCTION

1. In 1998, to protect Washington consumers from the annoyance and harassment caused by the burgeoning spam email industry, the Washington State Legislature enacted the Commercial Electronic Mail Act (CEMA), codified at chapter 190 of title 19 of the Revised Code of Washington (RCW).



CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
TEL. 317.636.6481 FAX 317.636.2593

2. Among other things, CEMA prohibits transmitting a commercial email to a Washington resident's email address that "[c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

3. Nobl does just what CEMA prohibits.

4. Nobl, a luggage and travel accessory retailer, bombards Washington consumers, including Plaintiff, with commercial emails whose subject lines employ various tactics to create a false sense of urgency in consumers' minds—and ultimately, from consumers' wallets.

5. This false urgency wastes consumers' time by enticing them to engage with Nobl marketing for fear of missing out and chokes consumers' email inboxes with repeated false notifications that the time to act—*i.e.*, *purchase*—is short.

6. And through this deceptive time-sensitivity, Nobl falsely narrows the field—steering consumers away from shopping for better deals—to its own products that must be purchased *now*.

7. Plaintiff challenges Nobl's harassment of Washington consumers with deceptive marketing as violations of the Commercial Electronic Mail Act (CEMA), RCW 19.190, and the Consumer Protection Act (CPA), RCW 19.86, seeking damages and injunctive relief against future violations.

## II. JURISDICTION AND VENUE

8. The Court has jurisdiction of this case under RCW 2.08.010.

9. Venue is proper in King County under RCW 4.12.020(3) because Plaintiff's cause of action, or some part thereof, arose in King County.

## III. PARTIES

10. Plaintiff Breanna Post is a resident of King County, Washington.



CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
TEL. 317.636.6481 FAX 317.636.2593

11. Defendant Nysonian, Inc., is a corporation incorporated in Canada with its principal place of business at 2967 Dundas St. W., # 272d, Toronto, ON M6P 1Z2.

12. Defendant Nysoniansolutions, Inc., is a corporation incorporated in Nevada with its principal place of business at 732 S. 6th St., Ste. R, Las Vegas, NV, 89101.

13. Both Defendants are engaged in sending the emails at issue in this action.

14. Defendant Nysonian, Inc., owns and manages the "Nobl Travel" trademark and brand.

15. A number of Nobl's marketing emails purport to be sent from Nobl's offices at 6255 N. Hollywood Blvd., Ste. 150, Las Vegas, NV 89116, which is also the address on file with the Nevada Secretary of State for the secretary of Defendant Nysoniansolutions, Inc.

16. Defendants sell their products in Washington through their website and are thus subject to personal jurisdiction in this Court. *See, e.g.*, *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021).

## IV. FACTUAL ALLEGATIONS

### A. CEMA protects Washington consumers from deceptive spam emails.

17. The Supreme Court of Washington has made clear: "[A]ll Internet users … bear the cost of deceptive spam." *State v. Heckel*, 143 Wn. 2d 824, 835 (2001) (en banc).

18. In 1998, the Legislature found that the "volume of commercial electronic mail" was "growing," generating an "increasing number of consumer complaints." Laws of 1998, ch. 149, § 1.

19. In the nearly three decades since, the problems caused by unsolicited commercial email, *i.e.* spam email, have grown exponentially.

20. And the problems are not limited to email content. Subject lines of emails are



CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
TEL. 317.636.6481 FAX 317.636.2593

framed to attract consumers' attention away from the spam barrage to a message that entices consumers to click and, ultimately, *purchase*.

21. In 2003, the United States Congress found that "[m]any senders of unsolicited commercial electronic mail purposefully include misleading information in the messages' subject lines in order to induce the recipients to view the messages." 15 U.S.C. § 7701(a)(8).

22. In 2012, one study estimated that Americans bear "costs of almost $20 billion annually" due to unsolicited commercial email. Justin M. Rao & David H. Reiley, *The Economics of Spam*, 26 J. of Econ. Perspectives 87, 88 (2012).

23. Even when bulk commercial email marketers are operating under color of consumer consent, the reality is that "[m]ost privacy consent"—especially under the "notice-and-choice" approach predominant in the United States—"is a fiction." Daniel J. Solove, *Murky Consent: An Approach to the Fictions of Consent in Privacy Law*, 104 Boston Univ. L. Rev. 593, 596 (2024).

24. Consumers therefore routinely "consent" to receive flurries of commercial emails which they did not meaningfully request and in which they have no genuine interest.

25. This includes emails sent to consumers from businesses with which they have no prior relationship—by virtue of commercial data brokers and commercial data sharing agreements.

26. Simply conducting the routine affairs of daily life often exposes consumers to unanticipated and unwanted volumes of commercial email. "Nowadays, you need an email address for everything from opening a bank account to getting your dog's nails trimmed, and … [o]nce you hand over your email address, companies often use it as an all-access pass to your inbox: Think of shopping websites that send account updates, deals, 'we miss you' messages, and holiday promotions throughout the year. It's too much." Kaitlyn Wells, *Email Unsubscribe Services Don't Really Work*, N.Y. Times Wirecutter (Aug. 19, 2024), https://perma.cc/U8S6-R8RU/.



CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
TEL. 317.636.6481 FAX 317.636.2593

27. The Legislature presciently intended CEMA to "provide some immediate relief" for these problems by prohibiting among other things commercial emails that "contain untrue or misleading information in the subject line." Laws of 1998, ch. 149, § 1.

28. CEMA thereby protects Washington consumers against the "harms resulting from deceptive commercial e-mails," which "resemble the type of harms remedied by nuisance or fraud actions." *Harbers v. Eddie Bauer, LLC*, 415 F. Supp. 3d 999, 1008 (W.D. Wash. 2019).

29. CEMA's "truthfulness requirements" increase the costs of sending deceptive commercial emails and thereby reduce their volume. *Heckel*, 143 Wn. 2d at 836.

30. CEMA's "truthfulness requirements" thereby advance the statute's aim of protecting consumers "from the problems associated with commercial bulk e-mail" while facilitating commerce "by eliminating fraud and deception." *Id.*

31. CEMA "mean[s] exactly what it says": in "broad" but "patently clear" language, CEMA unambiguously prohibits "sending Washington residents commercial e-mails that contain *any* false or misleading information in the subject lines of such e-mails." *Certification from U.S. Dist. Ct. for W. Dist. of Wash. in Brown v. Old Navy, LLC*, 567 P.3d 38, 44, 46–47 (Wash. 2025).

32. CEMA's protections do not depend on whether any email was (really or fictively) solicited by consumers, nor on whether consumers relied on any false or misleading statement contained in its subject line. *See Harbers*, 415 F. Supp. 3d at 1011.

33. The statute's only concern is to suppress false or misleading information in the subject line of commercial emails. *See Brown*, 567 P.3d at 44–45.

**B. The subject lines of Nobl marketing emails make false time scarcity claims.**

34. One common way online marketers "manipulate consumer choice by inducing false



CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
TEL. 317.636.6481 FAX 317.636.2593

beliefs" is to create a false sense of urgency or to falsely claim that consumers' time to act is scarce. Fed. Trade Comm'n, *Bringing Dark Patterns to Light* 4 (2022), https://perma.cc/847M-EY69/; *see also* U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 26 (2022), https://perma.cc/V848-7TVV/.

35. The FTC has identified the "False Limited Time Message" as one example of false time scarcity claims, in which the marketer creates "pressure to buy immediately by saying the offer is good only for a limited time or that the deal ends soon—but without a deadline or with a meaningless deadline that just resets when reached." *Bringing Dark Patters to Light*, *supra* para. 34, at 22.

36. "False or misleading scarcity claims can change the behaviour of consumers." *Online Choice Architecture, supra* para. 34, at 27.

37. Representations about the timing and duration of sales, discounts, and other special offers are fundamentally representations about prices, and such representations matter to ordinary consumers. *See, e.g.*, Huiliang Zhao *et al.*, *Impact of Pricing and Product Information on Consumer Buying Behavior with Consumer Satisfaction in a Mediating Role*, 12 Frontiers in Psychology 720151 (2021), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC8710754/pdf/fpsyg-12-720151.pdf/.

38. False scarcity claims are psychologically effective. As "considerable evidence" suggests, "consumers react to scarcity and divert their attention to information where they might miss opportunities." *Online Choice Architecture*, *supra* para. 34, at 26.

39. Invoking this time pressure achieves a seller's aim to narrow the field of competitive products and deals, by "induc[ing] consumers to rely on heuristics (mental shortcuts), like limiting focus to a restricted set of attributes or deciding based on habit." *Id.*



CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
TEL. 317.636.6481 FAX 317.636.2593

40. Under time pressure, "consumers might take up an offer to minimise the uncertainty of passing it up." *Id.*

41. False time scarcity claims thus *harm consumers* by manipulatively distorting their decision-making to *their detriment—and the seller's benefit*.

42. Indeed, one 2019 study found that "customers who took timed deals rather than waiting to see wider options ended up worse off than those who waited." *Id.* at 27.

43. False time scarcity claims also harm market competition. Consumers learn to ignore scarcity claims, "meaning that when a product [or offer] is truly scarce, the seller will not be able to credibly communicate this information." *Id.*

44. These false time scarcity claims are a staple of Nobl's email scheme to corral consumers to purchase its products, as the following examples demonstrate:

45. On December 1, 2025, Nobl sent a mass email to consumers with the subject line, "LAST CHANCE CYBER MONDAY". Nobl's 2025 "Cyber Monday" promotion offered up to 62% plus $25 off.

46. The subject line of the December 1, 2025, email was false or misleading. December 1 was not the "last chance" for anything. To the contrary, Nobl always intended to, and in fact did, continue to offer its Cyber Monday promotion beyond December 1.

47. On December 2, Nobl sent a mass email to consumers with the subject line, "Cyber Monday Extended 🎁 62% off at NOBL".

48. Nobl did not, in the early morning hours of December 2, reach the decision to "extend" the Cyber Monday promotion beyond December 1. The false "LAST CHANCE" and "Extended 🎁" messaging was part of one unified advertising campaign planned in advance.

49. Over and over again, Nobl's email marketing repeats this pattern, falsely or



CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
TEL. 317.636.6481 FAX 317.636.2593

misleadingly announcing the end of a promotion only to “extend” the promotion the very next day. As above, these “endings” and “extensions” are not genuine; they are components of unified advertising campaigns planned in advance.

50. Nobl spammed consumers with three examples of this scheme in November 2025:

51. On November 27, 2025, Nobl announced in an email subject heading, the “Final boarding call! 🔔” for a $20 off deal, telling consumers in the email that this was their “last chance” and urging, “Don’t miss your chance!” Use of the phrase “final boarding call” was no mistake by this purveyor of travel products—of course, consumers recognize this call-out, repeatedly made in every airport every day. Here, Nobl sought to motivate consumers to race to its website, just like they might to a departure gate.

52. But November 27 was not the “final boarding call” for the $20 off deal. On November 29, 2025, Nobl sent an email with the subject line, “We Extended Your Discount...” telling consumers in the email that the $20 off deal “expires next week.”

53. Then, on November 28, 2025, Nobl falsely or misleadingly announced, “Final Black Friday Hours: 62% OFF + Extra Savings”. But the very next day, November 29: “A few Black Friday deals survived”.

54. And on that same day, November 29, 2025, Nobl falsely or misleadingly announced, “62% OFF luggage… SALE ENDS TODAY”. But the very next day, November 30, the same promotion was renewed: “Airdrop your holiday gift early — 62% OFF”.

55. As these examples show, Nobl engages in an email marketing strategy whereby it creates a false sense of urgency, misrepresents when sales end, and then arbitrarily extends those sales to further pull in consumers with subject headings that are just not true.

56. In each case, by misleading consumers about the availability or duration of



CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
TEL. 317.636.6481 FAX 317.636.2593

promotions, Nobl is falsely or misleadingly advertising its *prices*, perhaps the most material term of any consumer transaction.

**C. Nobl knows when it sends emails to Washington residents.**

57. A sophisticated commercial enterprise, like Nobl, which is engaged in persistent marketing through mass email campaigns across the United States, has several ways of knowing where the recipients of its marketing emails are located. The means it employs are peculiarly with its knowledge.

58. First, the sheer volume of Nobl email marketing put it on notice that Washington residents would receive its emails. For the last four years, Nobl has been blasting out marketing emails at a rate of 200 to 300 per year.

59. Second, Nobl may obtain location information tied to email addresses when consumers make purchases from Nobl through digital platforms, including the Nobl website, or otherwise self-report such information to Nobl.

60. Third, Nobl may obtain location information tied to email addresses by tracking the IP addresses of devices used to open Nobl emails, which in turn can be correlated to physical location (as illustrated, for example, by the website https://whatismyipaddress.com/).

61. Fourth, Nobl may obtain location information tied to email addresses through the use of sophisticated marketing and analytics platforms. Specifically, to manage its email marketing campaigns, Nobl appears to use Klaviyo to manage its email marketing campaigns. Klaviyo tells Nobl where the recipients of its marketing emails are located using IP geolocation and other data extracted from recipients' interactions with Nobl, which Klaviyo tracks in detail. *See* "Understanding when and how Klaviyo sets a profile's location," Klaviyo (July 7, 2025) (describing "how a profile's location and timezone information are set and updated"),



CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
TEL. 317.636.6481 FAX 317.636.2593

https://help.klaviyo.com/hc/en-us/articles/115005073907/; "Understanding profiles in Klaviyo," Klaviyo (Aug. 5, 2025) ("Each individual profile features an activity log to capture a timeline of their interactions with your business," including receiving emails, opening emails, and clicking links within emails.), https://help.klaviyo.com/hc/en-us/articles/115005247088/.

62. Fifth, Nobl may obtain location information tied to email addresses by purchasing consumer data from commercial data brokers such as Acxiom, Oracle, and Equifax, which sell access to databases linking email addresses to physical locations, among other identifiers.

63. Sixth, Nobl may obtain location information tied to email addresses by using "identity resolution" services offered by companies such as LiveRamp, which can connect consumers' email addresses to their physical locations, among other identifiers.

64. Seventh, Nobl may obtain information that the recipients of its marketing emails are Washington residents because that information is available, upon request, from the registrant of the Internet domain names contained in the recipients' email addresses. *See* RCW 19.190.020(2).

65. It is thus highly probable that a seller of Nobl's size and sophistication employs not just one but several means of tying consumers' email addresses to their physical locations, at least at the state level.

**D. Nobl violated Plaintiff's right under CEMA to be free from deceptive commercial emails.**

66. Nobl has bombarded Plaintiff with commercial emails whose subject lines contain false or misleading statements in violation of her right to be free from such annoyance and harassment under CEMA.

67. Plaintiff received at least two of the emails discussed above, and likely most or all of them, though without saving them in her inbox.



CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
TEL. 317.636.6481 FAX 317.636.2593

68. Plaintiff received the December 1, 2025 email, described *supra* ¶¶ 45-48, at a personal Gmail address.

69. Plaintiff received the November 27 - 30, 2025 emails, described *supra* ¶¶ 50-54, at a personal Gmail address.

70. These emails contained false or misleading subject lines, in violation of CEMA, that misrepresented the timing and availability of promotions, and therefore, fundamentally, Nobl's prices.

71. Put differently, these emails contained false or misleading statements of fact as to the "duration or availability of a promotion." *Brown*, 567 P.3d at 47.

## V. CLASS ACTION ALLEGATIONS

72. Plaintiff brings this action under Civil Rule 23 on behalf of the following putative class ("Class"):

> All Washington residents who, during the Class Period, received a commercial email sent by the Defendants, on behalf of the Defendants, or with the Defendant's assistance, that contained messaging in the email subject line which misrepresented the facts of a sale, deal or promotion.

73. Excluded from this definition of the Class are Defendants' officers, directors, and employees; Defendants' parents, subsidiaries, affiliates, and any entity in which Defendants have a controlling interest; undersigned counsel for Plaintiff; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.

74. The Class Period extends from the date four years before this Class Action Complaint is filed to the date a class certification order is entered in this action.

75. Plaintiff reserves the right to amend the Class definition as discovery reveals additional emails containing false or misleading information in the subject line that Defendants sent or caused to be sent during the Class Period to email addresses held by Washington residents.



CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
TEL. 317.636.6481 FAX 317.636.2593

76. The Class is so numerous that joinder of all members is impracticable because the Class is estimated to minimally contain thousands of members.

77. There are questions of law or fact common to the class, including without limitation whether Defendants sent commercial emails containing false or misleading information in the subject line; whether Defendants sent such emails to email addresses they knew or had to reason to know were held by Washington residents; whether Defendants' conduct violated CEMA; whether Defendants' violation of CEMA constituted a *per se* violation of the CPA; and whether Defendants should be enjoined from such conduct.

78. Plaintiff's claims are typical of the Class's because, among other reasons, Plaintiff and Class members share the same statutory rights under CEMA and the CPA, which Defendants violated in the same way by the uniform false or misleading marketing messages they sent to all putative members.

79. Plaintiff will fairly and adequately protect the Class's interests because, among other reasons, Plaintiff shares the Class's interest in avoiding unlawful false or misleading marketing; have no interest adverse to the Class; and have retained competent counsel extensively experienced in consumer protection and class action litigation.

80. Defendants have acted on grounds generally applicable to the Class, in that, among other ways, they engaged in the uniform conduct of sending uniform commercial emails to Plaintiff and the Class, which violate CEMA and the CPA in the same way, and from which they may be enjoined as to Plaintiff and all Class members, thereby making appropriate final injunctive relief with respect to the Class as a whole.

81. The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, in that, among other ways, Defendants have



CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
TEL. 317.636.6481 FAX 317.636.2593

violated their rights under the same laws by the same conduct, and the only matters for individual determination are the number of false or misleading emails received by each Class member and that Class member's resulting damages.

82. A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, among other reasons, the claims at issue may be too small to justify individual litigation and management of this action on as a class presents no special difficulties.

## VI. CLAIMS TO RELIEF

### <u>First Claim to Relief</u>

### Violation of the Commercial Electronic Mail Act, RCW 19.190.020

83. Plaintiff incorporates and realleges paragraphs 1–71 above.

84. CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message … to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that … [c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).

85. Defendants are each a "person" within the meaning of CEMA. RCW 19.190.010(11).

86. Defendants initiated the transmission, conspired to initiate the transmission, or assisted the transmission of "commercial electronic mail messages" within the meaning of CEMA. RCW 19.190.010(2).

87. Defendants initiated the transmission, conspired to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendants knew, or



CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
TEL. 317.636.6481 FAX 317.636.2593

had reason to know, were held by Washington residents, including because Defendants knew that Plaintiff and putative members were Washington residents through "information is available, upon request, from the registrant of the internet domain name contained in the recipient's electronic mail address." RCW 19.190.020(b)(2).

88. Defendants initiated the transmission, conspired to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

89. For Defendants' violation of CEMA, Plaintiff is entitled to all available relief, including an injunction against further violations.

**Second Claim to Relief**

**Violation of the Consumer Protection Act, RCW 19.86.020**

90. Plaintiff incorporates and realleges paragraphs 1–71 above.

91. The CPA provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020.

92. A violation of CEMA is a *per se* violation of the CPA. RCW 19.190.030.

93. A violation of CEMA establishes all the elements necessary to bring a private action under the CPA. *Wright v. Lyft*, 189 Wn. 2d 718 (2017).

94. CEMA provides that "[n]o person may initiate the transmission, conspire with another to initiate the transmission, or assist the transmission, of a commercial electronic mail message … to an electronic mail address that the sender knows, or has reason to know, is held by a Washington resident that … [c]ontains false or misleading information in the subject line." RCW 19.190.020(1)(b).



CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
TEL. 317.636.6481 FAX 317.636.2593

95. Defendants are each a "person" within the meaning of CEMA. RCW 19.190.010(11).

96. Defendants initiated the transmission, conspired to initiate the transmission, or assisted the transition of "commercial electronic mail messages" within the meaning of CEMA. RCW 19.190.010(2).

97. Defendants initiated the transmission, conspired to initiate the transmission, or assisted the transmission of such messages to electronic mail addresses that Defendants knew, or had reason to know, were held by Washington residents.

98. Defendants initiated the transmission, conspired to initiate the transmission, or assisted the transmission of such messages that contained false or misleading information in the subject line, as described herein, in violation of CEMA. RCW 19.190.020(1)(b).

99. For Defendants' violation of the CPA, Plaintiff is entitled to an injunction against further violations; the greater of Plaintiff's actual damages or liquidated damages of $500 per violation, trebled; and costs of suit, including reasonable attorneys' fees.

## VII. JURY DEMAND

100. Plaintiff will demand a jury trial by separate document in accordance with Local Civil Rule 38(b).

## VIII. PRAYER FOR RELIEF

Plaintiff asks that the Court:

A. Certify the proposed Class, appoint Plaintiff as Class representative, and appoint undersigned counsel as Class counsel;

B. Enter a judgment in Plaintiff's and the Class's favor permanently enjoining Defendants from the unlawful conduct alleged;



CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
TEL. 317.636.6481 FAX 317.636.2593

C. Enter a judgment in Plaintiff's and the Class's favor awarding actual or liquidated damages, trebled, according to proof;

D. Award Plaintiff costs of suit, including reasonable attorneys' fees; and

E. Order such further relief the Court finds appropriate.

*[Counsel signatures to follow on next page.]*



CohenMalad, LLP
One Indiana Square, Suite 1400
Indianapolis, Indiana 46204
TEL. 317.636.6481 FAX 317.636.2593

Date: May 12, 2026

Respectfully submitted,

/s/ Lynn A. Toops
Lynn A. Toops, *pro hac vice*
Natalie A. Lyons*
Ian R. Bensberg*
**COHENMALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenmalad.com
nlyons@cohenmalad.com
ibensberg@cohenmalad.com

*/s/ Samuel J. Strauss*
Samuel J. Strauss, WSBA No. #46971
Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

Gerard J. Stranch, IV*
Michael C. Tackeff, *pro hac vice*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
gstranch@stranchlaw.com
mtackeff@stranchlaw.com

*Attorneys for Plaintiff*

*** Applications for admission *pro hac vice* forthcoming**